[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Nature and History of Proceedings
Aokusia T. was born on September 15, 1987. In August of 1989 Linda Carosella, a pediatric nurse practitioner from Mount Sinai Hospital, filed an affidavit in this court which indicated the following information. Aokusia was first seen by nurse Carosella when she was approximately thirteen months of age at a well-child visit in October of 1988. The child's mother Devaine T. had reluctantly indicated that she was pregnant again. She appeared depressed, spoke softly and established little eye contact. She discussed her anger and dislike toward the baby's father who was also the father of Devaine's other three daughters. She also described Aokusia as having become a source of constant irritation because of continual crying and clinging and that she would often leave Aokusia in her crib because she could not tolerate the childs' behavior and she considered sending Aokusia "down south" to live with relatives.
Devaine T.'s fourth infant was born in February of 1989. Aokusia's physical status and relationship with her mother were deteriorating. At subsequent clinic visits mother spoke negatively about Aokusia. She repeatedly reprimanded, ridiculed and threatened Aokusia inappropriately. On March 16, 1989 there was a documented weight loss for Aokusia of two pounds and six ounces. Notwithstanding the attention of the Saint Francis medical staff by May 9, 1989 Aokusia had regained only two ounces over the previous seven weeks, the child appeared fearful of her mother during the visit, the mother indicated that Aokusia had a foul smelling breath, yet a throat culture done at that time ruled out medical problems. Over the next several weeks through telephone contact with mother, mother indicated that the family wanted no contact with Aokusia. The case was studied by the clinic child protection team at Saint Francis Hospital. During the same period of time mother stated to the Department of Children and Youth Services social worker and to the hospital that Aokusia had been eating her feces on three occasions. On July 20, 1989 when Aokusia was brought into the hospital she had lost an additional thirteen ounces; she had a foreign body lodged in her left nostril with profuse purulent discharge; her CT Page 6482 physical appearance had deteriorated; she appeared emaciated with decreased skin turgor, a scaphoid abdomen, and loss of subcutaneous fat; her growth parameters had drastically decreased; her weight percentile had dropped from once being greater than the ninety-fifth percentile (95%) to the tenth percentile (10%). During the clinic visit, the child was quiet and passive, the mother focused on an offensive odor from the childs' nasal discharge and her own aggravation at having to wait in the clinic to be seen.
The child was immediately admitted to the pediatric unit of the St. Francis Hospital and Medical Center. Within two weeks following the admission, the Saint Francis Hospital child protection team, on August 3, 1989 reported that Aokusia had made very positive adjustment to the hospital environment, she had an excellent appetite, had gained weight consistently, was happy and playful. The primary nurse described an episode in which Aokusia saw her mother walk into the pediatric floor and immediately ran to her primary nurse crying and clinging to her leg.
The events and facts narrated in this affidavit by Linda Carosella present the classic case of non-organic failure to thrive (FTT).
On August 7, 1989 a neglect petition was filed in the Juvenile Court. During the next few months the child was evaluated, services were offered to mother, and in some instances mother was complying and visitation was occurring. On January 9, 1990 an adjudication of uncared for with specialized needs was made and neglect allegations were dismissed without finding and without prejudice. It was anticipated that the child would go home for extended visits and that ultimately the child would be returned to the home. By April 10, 1990 things had significantly changed. The Department of Children and Youth Services social worker indicated that mother had not cooperated, was not at home, had not made her visits and was not inquiring about her child, nor did she attend the dispositional hearing in the juvenile court. During this period of time the mother disclosed to the foster mother, and to Linda Carosella R.N., that the child was beyond her control, that she did not want to keep Aokusia CT Page 6483 any longer. She further indicated that she was leaving the State and that the child should be put up for adoption. Accordingly, on April 10, 1990 the court entered a disposition committing the child to the Department of Children and Youth Services for eighteen months. This child has been committed ever since.
Approximately four months later on August 25, 1990 the social worker received an inquiry from Carl T. who is the acknowledged father of this child, the father indicated that he was incarcerated as had previously been known, and that he would not be paroled until April of 1992. The father indicated that his plan was to place the child with his parents in Pennsylvania, however, the paternal grandparents failed to acknowledge the letters and inquiries made to them by the Department.
On March 21, 1991 when Aokusia was three and a half years of age, having not heard further from either mother or father, the Department filed petitions to terminate the parental rights of both mother and father. While the action for termination of parental rights was pending, there was some communication with the father which resulted in a transfer of placement of Aokusia to the father's stepbrother's fiance and apparently the child was contacted by the father by phone and a visit was arranged. At this point in time, the termination petition was withdrawn or dismissed without prejudice since it appeared that there was some interest by the father in reunification with the child. This was a cruel disservice perpetrated upon the child and a great injustice since the father never followed through on his plans to visit and establish a reunification of the family. This careless act in effect delayed a permanent plan for this child for almost an additional three years. The placement with Mr. T.'s stepbrother's fiance' did not work out due to the noncompliance by the fiance with Department of Children and Families foster care regulations. The child was a hapless pawn to these events.
Since 1992 Aokusia has been placed in a foster home where she is doing well. The child is involved with therapy at Child and Family Services and the present placement is a potential adoptive home. CT Page 6484
The social study indicates that the natural mother has not visited this child since January 12, 1990 and that the father has not seen the child since December 1989.
II. Present Proceeding
On February 15, 1994 the Department of Children and Families filed a second petition to terminate the parental rights of Devaine T. and Carl T. The last known address of both mother and father was in the state of Georgia. The Department had an address for father and attempted to serve him by certified mail, this did not result in successful service and a subsequent order of notice was for publication in a paper circulating in Ashburn, Georgia. At a hearing on March 15, 1994 the court directed the Department to investigate relatives of the father to see if a more accurate address could be obtained for him.
In an addendum to the social study (State's Exhibit B) the social worker Kellena Nelson indicates that she had written and called the paternal grandfather Melvin Taylor. The paternal grandfather indicated that Carl, the child's father, was no longer in prison and was residing with the grandparents in that home in Chambersberg, Pennsylvania. The paternal grandfather indicated that he would tell his son of the call by the Department and that the nature of the call related to the child, Aokusia T. and also that they were enquiring regarding the whereabouts of the mother, Devaine T. Having no response from the father, the social worker called again eight days later. The paternal grandfather indicated that he had given his son the previous message which had been left on March 15, 1994. The Department of Children and Families' social worker again sent a certified letter on March 29, 1994 that was signed by the paternal grandfather. At no time did the paternal grandfather indicate that he was interested in Aokusia T. or wished to be considered as a resource for placement. Thereafter this court determined that the parties had received constructive notice of the pendency of these proceedings. CT Page 6485
Subsequently on May 25, 1994, at the commencement of the trial on the termination petition, the court denied the father's oral motion to dismiss for lack of jurisdiction. Counsel for the father argued that Carl T. was an improper party in that there was insufficient indicia that he was the father of this child!
By agreement of all of the parties the court was permitted to take judicial notice of the entire file. The court received testimony from Kellina Nelson, the social worker from the Department of Children and Families; the social study and the addendum to the social study were marked as full exhibits; no other witnesses were offered.
III. Adjudication
The court finds by clear and convincing evidence existing at the date of the filing of the petition that the child Aokusia T. has been abandoned by the mother and father in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
Further, the court finds that Aokusia has been found in a prior proceeding on January 9, 1990 as having been an uncared for child. The court finds that mother and father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child that they could assume a responsible position in the life of this child.
The court finds that there is no ongoing parent and child relationship with respect to the mother and father, which is defined as the relationship that ordinarily develops as the result of the parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interest of the child.
The court further finds that with respect to both the mother and father the grounds have existed for more CT Page 6486 than one year.
IV. Best Interests
Having found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of parental rights with regard to Aokusia have been proved, the court must consider and make findings on each of the seven enumerated criteria of General Statutes § 17a-112.
1. Services offered; the Department made numerous efforts initially to provide services for mother to rehabilitate herself and reunify herself with the child as indicated earlier mother abandoned these efforts and left the State and has not been heard from since.
2. Compliance with federal Child Welfare Act; the court finds that the Department of Children and Families made reasonable efforts given the situation and circumstances to reunite mother and child and also to place the child in a situation appropriate for father, these efforts were made and the Department conducted itself in accordance with Federal law.
3. Court Orders; the Department with the approval of the court set reasonable and realistic expectations initially in order to reunify the child with the mother. There was initially minimal compliance by mother and subsequently no compliance. Due to the father's incarceration and subsequent failures to initiate and follow through on contact for visitation and possible subsequent reunification, that the father failed to participate, notwithstanding his actual notice that the Department was involved with his child, that his child was committed to the Department and that not only he but his parents also were aware of this and made no meaningful efforts to make themselves available as a placement resource.
4. Significant emotional ties; this child has strong emotional ties with the foster family which has provided her with physical, emotional, and educational support. This child has no known emotional ties to either biological parent. CT Page 6487
5. Age of the child; Aokusia will be seven years old in September of 1994. She first came into the care of the Department of Children and Youth Services (now known as Department of Children and Families) when she was less than two years of age. The failure to have a permanency plan in place and approved by the court was delayed for more than three years by the cavalier and irresponsible representations of the father that he or his family would be actively pursuing reunification with this child. Neither he nor his family ever followed through to the great disservice to this child.
6. Regarding parents' efforts to conform their conduct to the best interest of the child; it is an understatement to indicate that neither parent has made realistic or sustained efforts to conform their conduct to even minimally acceptable parental standards regarding this particular child.
7. Interference with meaningful relationship; the Department of Children and Families attempted in every way to work toward reunification with the mother until she precipitously left the State nearly four years ago. The Department further abated its action on a prior termination of parental rights plan to allow father and/or his parents to actively intervene to be reunited with this child. The father acted in bad faith to the great detriment of this child who has for the last three years lived without a permanent placement approved by the court.
Based upon the foregoing findings the court concludes that it is in the best interests of this child to terminate the parental rights of Carl T. and Devaine T.
V. Order
It is accordingly ordered that the parental rights of Carl T. and Devaine T. are hereby terminated. The Commissioner of Department of Children and Families is hereby appointed the statutory parent, a permanency plan shall be submitted within ninety days as required and a motion to review plan for terminated child shall be filed CT Page 6488 in accordance with federal law.
VI. Appeal
The parents have twenty days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel is willing to continue representation, this court will appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book § 4017. The respondent father and mother shall establish their indigency in accordance with Practice Book requirements. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book § 4040. Such motions, if unopposed, will be grantedex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the court clerk of the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the State. Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke. 152 Conn. 501 (1964).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is afortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted. Given the delays which have occurred to date, no unreasonable delays will be countenanced.
Foley, J. CT Page 6489